UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RAYMOND LEFEVRE, DONALD E. RAGONE,
ROY S. GULLICKSEN, NANCY MASLE
BOWERMAN, DANIEL J. CARLIN, LARRY L.
MILLER, ROY HENZLER, ROBERT BEAMISH,
ROBERT P. CEDRO, Individually and as a
class of persons similarly situated,

        Plaintiffs,

  -v-              1:06-CV-768

NIAGARA MOHAWK POWER CORPORATION,
NATIONAL GRID USA SERVICE COMPANY, INC.,
NATIONAL GRID, NATIONAL GRID USA,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:        OF COUNSEL:

BLITMAN & KING, LLP      EDWARD J. STEVE, ESQ.
Attorneys for Plaintiffs
16 West Main Street
Suite 207, The Powers Building
Rochester, NY 14614

BOND, SCHOENECK AND KING, PLLC  LOUIS ORBACH, ESQ.
Attorneys for Defendants      ROBERT A. LABERGE, ESQ.
One Lincoln Center
Syracuse, NY 13202-1355

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

  Plaintiffs filed this putative class action on June 21, 2006. They filed a Second

Amended Complaint on April 17, 2007, alleging a single cause of action for age

discrimination pursuant to the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-634 ("ADEA").  Defendants filed an Answer on May 1, 2007.  Plaintiffs made a motion for class certification that was stayed pending discovery and anticipated dispositive motions on the threshold issue of liability.

Defendants filed a motion for judgment on the pleadings or in the alternative for summary judgment.  Plaintiffs opposed the motion.  Oral argument was heard on April 11, 2008.  Decision was reserved.

## II. BACKGROUND

Plaintiffs are former employees of defendant Niagara Mohawk Power Corporation ("the Company"), some of whom were represented by a union ("represented plaintiffs") and some of whom were not represented by a union ("non-represented plaintiffs") (collectively "plaintiffs").  Plaintiffs retired from service with the Company at varying times between May 1, 1996, and September 30, 2004.  Plaintiffs are participants in the Company's Medical, Prescription Drug, and Life Insurance Plan for Retired Former Represented Employees ("Represented Plan") or the Company's Medical, Prescription Drug, and Life Insurance Plan for Retired Former Non-represented Employees ("Non-represented Plan") (collectively, "the Plans"), respectively.  The Plans provide plaintiffs a choice from a variety of health care benefit programs and options to cover plaintiffs and their eligible dependents, if elected.

In 2001 the Company amended the Plans in an effort to control escalating costs. Pursuant to the amendment, employees, like plaintiffs, who retired after May 1, 1996, would

be required to share in the cost of the health benefit plan they select, beginning January 1, 2003. The Plans[1] provided:

> Participants and their eligible Dependents have no Medical Care/Prescription Drug Program monthly premium obligations up through December 31, 2002. Commencing January 1, 2003 and ending on December 31, 2009, monthly increases in the premiums or premium equivalents for benefits under the Medical Care/Prescription Drug Program (for pre-65 Health Care Plan coverage or post-65 Medigap Contract coverage, as applicable) that occur after December 31, 2002 ("Premium Increases") shall be determined on an annual basis (using 2002 health care premiums as the base) and shall be paid in accordance with the terms of the applicable provisions of the Medical Care/ Prescription Drug Program as follows: (I) Medical Care/Prescription Drug Program Participants (and their covered Spouse and/or covered Dependents) shall pay the first $ 100 a month of such Premium Increases; and (ii) Medical Care/Prescription Drug Program Participants (and their covered Spouse and/or covered Dependents) shall pay 10 percent of the Premium Increases, and the Employer shall pay 90 percent of the Premium Increases in excess of the first $ 100 a month of such Premium Increases. The Employer's contribution rate for monthly benefits shall, however, be capped (frozen) at the level in effect as of December 31, 2009. All subsequent Premium Increases are borne by the Participant (and their covered Spouse and/or covered Dependents).

(Moreau Decl. Ex. A § 8.1(b)(ii).) Thus, up to December 31, 2002, the Company continued to provide retirees health benefit coverage at no cost to retirees. After December 31, 2002, retirees were responsible for paying the first $100 per month premium increase, then ten percent of any increase above $100 per month. However, as of December 31, 2009, the Company's contribution toward additional increases would cease; that is, retirees would be responsible for paying all additional increases in premiums after December 31, 2009.

---

[1] There are minor wording differences between the Represented and Non-represented Plans that have no substantive effect. Accordingly, for ease of reference the Represented Plan provisions are quoted and cited throughout this opinion. The Non-represented Plan is found in the Moreau Declaration Exhibit B.

The Plans further provide that eligible participants or dependents must enroll in Medicare Parts A and B and that Medicare is the primary coverage.[2] (Moreau Reply Decl. Ex. A, D.) The Plans provide benefits such that the total amount payable by Medicare and the Plan does not exceed 100 percent of the covered incurred expenses. Additionally, the Plans were modified effective January 1, 2005, to integrate the newly-enacted Medicare Part D, which is not at issue in this action. See id. at Ex. C, E.

The following examples of premiums for 2003 and 2007 demonstrate how the retirees' contributions to health benefit plan premium increases are calculated.

The premium for the Represented Plan Preferred Provider Organization ("PPO") non-Medicare eligible employee only option in 2002 was $289.00. In 2003 the premium for the same option was $298.44, an increase of $9.44. Thus, because the increase was less than $100.00, the retiree was responsible for paying the full amount of the increase, $9.44 (approximately 3.2% of the total premium). Similarly, the premium for the Represented Plan Point-of-Service ("POS") non-Medicare eligible employee only option in 2002 was $269.37. In 2003 the premium for the same option was $282.40, an increase of $13.03. Again, because the increase was less than $100.00, the retiree was responsible for paying the full amount of the increase, $13.03 (approximately 4.6% of the total premium).

The premium for the Represented PPO Medicare eligible employee only option in 2002 was $228.58. In 2003 the premium for the same option was $260.08, an increase of

---

[2] Although inapplicable in this context, the Plans allow for primary coverage before Medicare where required by law. (Moreau Reply Decl. Ex. A, D.)

$37.50. The increase, less than $100.00, was paid by the retiree in the amount of $37.50 (approximately 14.4% of the total premium). The premium for the Represented POS Medicare eligible retiree in 2002 was $167.76. In 2003 the premium was $208.26, an increase of $40.50. Therefore, the retiree was required to pay the full amount of the increase, $40.50 (approximately 19.4% of the total premium).

In 2007 the premium for the Represented Plan PPO non-Medicare eligible employee only option was $450.59 and the retiree's contribution was $106.75. The increase over the 2002 premium was $167.48. Therefore, the retiree contribution was $106.75 (approximately 23.7% of the total premium), consisting of $100.00 plus ten percent of $67.48 (the amount of increase over $100.00), or $6.75. The premium for the POS plan was $377.21 and the retiree's contribution was $101.08 (approximately 26.8% of the total premium).

The premium for the Represented Plan PPO Medicare eligible employee only option was $416.00 and the retiree's contribution was $104.86 (approximately 25.2% of the total premium). The premium for the POS plan was $301.00 with the retiree's contribution of $103.32 (approximately 34.3% of the total premium).

The essence of plaintiffs' claims is that Medicare-eligible retirees pay greater dollar amounts, and greater percentages of the total premium, for the same coverage, as do non-Medicare eligible retirees, in violation of the ADEA.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any

material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986).  The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986).  Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586, 106 S. Ct. at 1356.  At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56; <u>Liberty Lobby, Inc.</u>, 477 U.S. at 250, 106 S. Ct. at 2511; <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587, 106 S. Ct. at 1356.  To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248-49, 106 S. Ct. at 2510; <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587, 106 S. Ct. at 1356.

### B. <u>Analysis</u>

The ADEA makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C.A. § 623(a) (West 2008).  The statute protects individuals

forty years of age and older. Id. § 631. "Compensation, terms, conditions, or privileges of employment" includes employee benefit plans. Id. § 630(l).

However, the statute authorizes the Equal Employment Opportunity Commission ("EEOC") to issue regulations to effectuate the ADEA and expressly allows establishment of "such reasonable exemptions to and from any or all provisions" of the statute "as it may find necessary and proper in the public interest." Id. § 628. The EEOC promulgated a regulation exempting from the ADEA health benefit plans that are coordinated with Medicare. The regulation provides:

> Exemption. Some employee benefit plans provide health benefits for retired participants that are altered, reduced or eliminated when the participant is eligible for Medicare health benefits . . . whether or not the participant actually enrolls in the other benefit program. . . . [I]t is hereby found necessary and proper in the public interest to exempt from all prohibitions of the Act such coordination of retiree health benefits with Medicare or a comparable State health benefit plan.

29 C.F.R. § 1625.32(b) (2008). The exemption is to be construed narrowly. Id. § 1625.32(c).

Further, the ADEA provides a safe harbor for employers to implement a bona fide employee benefit plan where the plan either costs the same as that provided for younger workers or provides the same benefits as provided to younger workers. Id. § 623(f)(2)(B)(I). This safe harbor provision is referred to as the equal cost/equal benefit principle.

The health benefit plans at issue here change when a retiree becomes Medicare-eligible. The Plans require that a Medicare-eligible retiree enroll in Medicare Parts A and B, and, should the retiree not enroll, that benefits be paid as if the enrollment had occurred.

- 7 -

The Plans provide that the benefits are coordinated with Medicare such that benefits are not duplicated and Medicare is the primary payor.[3]  In effect, Medicare pays the appropriate amount for services that it covers, then the Plans cover the difference between what Medicare paid and what would have been paid by the Plans had Medicare not been involved. Further, if there are some services not covered by Medicare that would be covered under the non-Medicare eligible Plan, then the Medicare eligible Plan does cover the service to the same extent as for non-Medicare eligible retirees.  Thus, the amount of health benefits are the same whether the retiree is Medicare eligible or not.  However, the source of the benefit payments is the Plan for non-Medicare eligible retirees and Medicare plus the Plan for Medicare eligible retirees.  In this sense the health benefits for Medicare eligible retirees are reduced because the benefit paid by the plan is the difference between the allowed charge less the Medicare payment, as opposed to the entire allowed charge.

Because the Plans coordinate coverage with Medicare, and the health benefits are reduced when the retiree becomes eligible for Medicare, the Plans fall squarely within the exemption to the ADEA that permits reduction of benefits based upon age (i.e., Medicare eligibility).  See 29 C.F.R. § 1625.32(b).  Therefore, the Plans do not violate the ADEA.

The Plans also fall within the "equal cost or equal benefit" safe harbor.  Here the Plans clearly do not fall within the "equal cost" prong of the safe harbor provision because it is undisputed that the Company pays less for the Medicare eligible premium than it pays for the non-Medicare eligible premium.  For example, in 2003, the premium for a non-Medicare

---

[3] Plaintiffs argue that the Plans are based solely on age and they don't "coordinate" with Medicare.  This argument is unavailing because the only criteria for Medicare eligibility is reaching age 65, thus any benefit plan that coordinates with Medicare must be based upon age.  Following this theory to its conclusion, since all plans that coordinate with Medicare are based upon age, no plans would be exempt under 29 C.F.R. § 1625.32(b).

eligible PPO employee only plan was $298.44, of which the employee paid $9.44 and the Company paid $289.00.  In contrast, the premium for a comparable Medicare eligible plan was $260.08, of which the employee paid $37.50 and the Company paid $222.58.  Thus, in 2003, for the PPO plans the Company paid $289.00 for a non-Medicare eligible retiree's premium and only $222.58 for a Medicare eligible retiree.  Therefore, because the Company's cost for Medicare eligible and non-Medicare eligible retirees' premiums is not equal, the "equal cost" prong of the safe harbor provision does not apply.  See 29 U.S.C. § 623(f)(2)(B)(I).

The proper focus in determining the "equal benefit" prong of the safe harbor provision is on the retiree.  Where the benefit derived from the plan is the same for the Medicare-eligible retiree as it is for the younger, non-Medicare eligible retiree, the "equal benefit" prong is met and the safe harbor provision applies.  See Erie County Retirees Ass'n v. County of Erie, Pa., 220 F.3d 193, 216 (3d Cir. 2000) (directing the district court on remand that to satisfy the equal benefit prong the employee benefits to all workers must be the same).  Here, although the source of the benefit to the Medicare eligible retiree is a combination of Medicare and the Plan, the actual benefit received is the same as that received by a non-Medicare eligible retiree for the same covered services.  Accordingly, because the benefits are equal for the Medicare eligible and non-Medicare eligible retirees, the plans, although facially discriminating based upon age, are not unlawful.  See 29 U.S.C. § 623(f)(2)(B)(i).  The Plans fall within the "equal benefit" prong of this safe harbor provision.

Plaintiffs argue that the Company fails to meet the equal benefit/equal cost standard, because it does not bear the same proportion of the total cost of the premium for younger and older employees, pointing to 29 C.F.R. § 1625.10(d)(4)(ii).  The purpose of this

- 9 -

regulation is to assure that any reductions in benefits to older workers are justified by the cost.  See id. § 1625.10(a)(1).  For example, a plan does not violate the ADEA "where the actual amount of payment made, or cost incurred, in behalf of an older worker is equal to that made or incurred in behalf of a younger worker, even though the older worker may thereby receive a lesser amount of benefits."  Id.

Plaintiffs' argument turns this regulation on its head--under plaintiffs' reading, an employer is required to pay additional monies (equal to that paid for younger workers), even though payment of the lesser amount yields the same benefit to the Medicare eligible retiree as to the younger, non-Medicare eligible retiree.  To illustrate plaintiffs' contention, in 2003, the premium for a non-Medicare eligible PPO employee only plan was $298.44, of which the Company's portion was $289.00.  The premium for the comparable Medicare eligible PPO plan was $260.08.  According to plaintiffs' reading of the regulation, the Company must pay $289.00 (equal to the amount paid for the non-Medicare eligible retiree's premium), although the total premium was only $260.08.  It simply makes no sense to require payment of more than the total premium amount to achieve "equality."  Moreover, the specific subsection of the regulation relied upon by plaintiffs does not apply in this situation.  Rather, it applies to prevent an older employee from being "required, as a condition of employment, to make greater contributions than a younger employee in support of an employee benefit plan."  Id. § 1625.10(d)(4)(ii).  Thus, plaintiffs' argument that the Plans are not saved by the equal cost/equal benefit safe harbor provision fails.

IV. **CONCLUSION**

The Plans coordinate with Medicare and therefore fall within the exemption permitting reduced benefits. Additionally, the Plans fall within the equal cost/equal benefit safe harbor. Plaintiffs' arguments to the contrary fail.

Accordingly, it is

ORDERED that defendants' motion for summary judgment is GRANTED and the complaint is DISMISSED in its entirety.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

_____
David N. Hurd
District Judge

Dated: April 21, 2009
   Utica, New York.